*Exhibit #1*

| Main Page | Intake Form | Person Form | CPU Form | Search |
|---|---|---|---|---|

| STATEMENT OF FACTS IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT | APPLICATION NO. (COURT USE ONLY) | PAGE ⊥ OF ⊥ | Trial Cour District C |
|---|---|---|---|

The undersigned alleges the following as a ☐ full or ☐ partial statement of the factual basis for the offense(s) for which a criminal complaint is sought.

Cli

On Monday, October 27, 2014 at approximately 2103 hours inmate Carlos Bastos W103148 did commit Assault and Battery on Correctional Officer Brandon Andrews. On the above date and time Officer Parrent was conducting a security round in the P1 Housing Unit. During the round Officer Parent could smell fermented fruit (homemade alcohol) as he walked by cell P1-41. Once he completed his round he returned to cell 41 to search the cell for homemade alcohol. Officer Parent ordered inm Bastos, who was inside the cell, to leave the cell so that he could conduct his search. As Offic Parent was conducting the search he did see inmate Manuel Dasilva W100116 standing in the doorwa of the cell. Officer Parent gave Dasilva a direct order to leave the area. Dasilve replied by saying "Fuck you Parent, I'll watch." Officer Parent gave another order for Dasilva to leave the area. At this time Dasilva stepped into the cell toward Officer Parent and stated "I'll just flu it brah, don't be a fag." Dasilva then pushed Officer Parent away and grabbed the bag of homemad alcohol. Officer Parent then ordered Dasilva to "cuff up" (turn around and place his hands behin his back to be handcuffed). Dasilva then struck Officer Parent in the right side of his face wit closed fist punch. Officer parent then called an "Officer needs assistance" emergency via his tw way radio, and attempted to gain control of Dasilva. As the two struggled with each other, Dasil continued to strike Officer Parent with closed fist punches. Officer Brandon Anrews was the firs responder to the scene. Officer Andrews witnessed Dasilva throwing closed fist punches and kicks Officer Parent. As Officer Andrews assisted Officer Parent, Dasilva also threw closed fist punch at Officer Andrews. Officer Carl Bergeron was the second responder at the scene. Officer Bergero posted up in the doorway of the cell and prevented other inmates from entering the cell and gett involved. Inmate Jason Barbosa W103758 forced his way into the cell by pushing Officer Bergeron into the cell. Once Barbosa entered the cell he began assaulting Officer Parent by kicking him i the rib area. Immediately after Barbosa enters the cell, inmate Carlos Bastos W103148 enters the cell and begins striking Officer Andrews in the back of the head with closed fist punches.

| PRINTED NAME | SIGNATURE | I AM A | DATE SIGNED |
|---|---|---|---|
| Todd Smith | | ☑ LAW ENFORCEMENT OFFICER | 02/24/2015 |
| | | ☐ CIVILIAN COMPLAINANT OR WITNESS | |

ADDITIONAL FACTS FOUND BY CLERK-MAGISTRATE/ASST. CLERK/JUDGE BASED ON ORAL TESTIMONY

| REMARKS | SIGNATURE OF CLERK-MAGISTRATE/ASST. CLERK/JUDGE | DATE SIGNED |
|---|---|---|
| | | |

| | Save | | Print | |

## 1568CR000281 Commonwealth vs. Bastos, Carlos A

*Exhibit*
*# 2*

- **Case Type:**
  Criminal
- **Case Status:**
  Closed
- **File Date**
  03/04/2015
- **DCM Track:**

- **Initiating Action:**
  A&B ON CORRECTIONAL FACILITY EMPLOYEE c127 §38B(b)
- **Status Date:**
  05/05/2016
- **Case Judge:**

- **Next Event:**

---

| All Information | Party | Charge | Event | Docket | Disposition |

### Party Information

**Bastos, Carlos A**
**- Defendant**

| Alias | **Party Attorney** |
|---|---|
| | **Attorney** |
| | Ball, Esq., Michael J |
| | Bar Code |
| | 027880 |
| | Address |
| | 258 Sterling Rd |
| | Lancaster, MA 01523 |
| | Phone Number |
| | (978)368-8642 |
| | Attorney |
| | Cawley, Jr., Esq., James W |
| | Bar Code |
| | 566884 |
| | Address |
| | Law Offices Of James W Cawley |
| | 382 Boston Turnpike |
| | Shrewsbury, MA 01545 |
| | Phone Number |
| | (508)845-9333 |

**More Party Information**

### Party Charge Information

- **Bastos, Carlos A**
- **- Defendant**
  Charge # 1:
  **127/38B-1 - Felony     A&B ON CORRECTIONAL FACILITY EMPLOYEE c127 §38B(b)**
- Original Charge
- 127/38B-1 A&B ON CORRECTIONAL FACILITY EMPLOYEE c127 §38B(b)
  (Felony)
- Amended Charge

| **Charge Disposition** |
|---|
| Disposition Date |
| Disposition |
| 07/28/2015 |
| Guilty |

### Events

| Date | Session | Location | Type | Result |
|------|---------|----------|------|--------|
| 03/16/2015 08:30 AM | Trial Session (Clinton) | | Arraignment | Held-Arraignment/58A Danger Request |
| 05/04/2015 08:30 AM | Trial Session (Clinton) | | Pretrial Hearing | Held |
| 06/15/2015 08:30 AM | Trial Session (Clinton) | | Discovery Compliance & Jury Election | Event Continued |
| 07/28/2015 08:30 AM | Trial Session (Clinton) | | Discovery Compliance & Jury Election | Held |

## Docket Information

| Docket Date | Docket Text | Image Avail. |
|-------------|-------------|--------------|
| 03/04/2015 | Event Scheduled<br>Event: Arraignment<br>Date: 03/16/2015  Time: 08:30 AM<br>Result: Held-Arraignment/58A Hearing | |
| 03/04/2015 | Habeas Corpus for prosecution issued to Souza Baranowski Correctional Center returnable for 03/16/2015 08:30 AM Arraignment:<br><br>Further Orders: | |
| 03/16/2015 | Event Resulted<br>The following event: Arraignment scheduled for 03/16/2015 08:30 AM has been resulted as follows:<br>Result: Held-Arraignment/58A Hearing | |
| 03/16/2015 | Appearance for  filed by Attorney . | |
| 03/16/2015 | Defendant is ordered committed to Worcester House of Correction in lieu of having posted bail in the amount ordered: ($$20,000.00 Bond; $$2,000.00 Cash), returnable for 05/04/2015 08:30 AM Pretrial Hearing; mittimus issued.<br><br><br>Court location of next event (if not your court):<br><br>Further Orders: | |
| 03/16/2015 | Habeas Corpus for prosecution issued to MCI - Cedar Junction (at Walpole) returnable for 05/04/2015 08:30 AM Pretrial Hearing:<br><br>Further Orders: | |
| 03/16/2015 | Appearance for  filed by Attorney . | |
| 05/04/2015 | Event Resulted<br>The following event: Pretrial Hearing scheduled for 05/04/2015 08:30 AM has been resulted as follows:<br>Result: Held | |
| 05/04/2015 | Defendant is ordered committed to Worcester House of Correction in lieu of having posted bail in the amount ordered: ($$20,000.00 Bond; $$2,000.00 Cash), returnable for 06/15/2015 08:30 AM Discovery Compliance & Jury Election; mittimus issued.<br><br><br>Court location of next event (if not your court):<br><br>Further Orders: | |
| 05/04/2015 | Habeas Corpus for prosecution issued to MCI - Cedar Junction (at Walpole) returnable for 06/15/2015 08:30 AM Discovery Compliance & Jury Election:<br><br>Further Orders: | |
| 06/15/2015 | Event Resulted<br>The following event: Discovery Compliance & Jury Election scheduled for 06/15/2015 08:30 AM has been resulted as follows:<br>Result: Event Continued<br>Appeared: | |
| 06/15/2015 | Defendant is ordered committed to Worcester House of Correction in lieu of having posted bail in the amount ordered: ($$20,000.00 Bond; $$2,000.00 Cash), returnable for 07/28/2015 08:30 AM Discovery Compliance & Jury Election; mittimus issued.<br><br><br>Court location of next event (if not your court):<br><br>Further Orders: | |

| Docket Date | Docket Text | Image Avail. |
|---|---|---|
| 06/15/2015 | Habeas Corpus for prosecution issued to Souza Baranowski Correctional Center returnable for 07/28/2015 08:30 AM Discovery Compliance & Jury Election:<br><br>Further Orders: | |
| 07/28/2015 | Event Resulted<br>The following event: Discovery Compliance & Jury Election scheduled for 07/28/2015 08:30 AM has been resulted as follows:<br>Result: Held<br>Appeared: | |
| 07/28/2015 | Charges Disposed:<br>Charge #1 A&B ON CORRECTIONAL FACILITY EMPLOYEE c127 §38B(b)<br>    Date: 07/28/2015<br>    Method: Guilty Plea<br>    Code: Guilty<br>    Judge: Sargent, Hon. Dennis P | |
| 07/28/2015 | Sentence Imposed:<br>Sentence Date: 07/28/2015 Judge: Sargent, Hon. Dennis P<br><br>Charge #: 1 A&B ON CORRECTIONAL FACILITY EMPLOYEE c127 §38B(b)<br>Committed to HOC<br>Term: 0 Years, 0 Months, 30 Days<br><br>To Serve: 0 Years, 0 Months, 30 Days<br><br>Served Consecutive Case sentence now serving<br><br>Committed to Worcester County House of Correction | |
| 05/05/2016 | Case was automatically closed and disposed on 05/05/2016 per AODC request. The case had  a case-status of "Disposed for Statistical purposes" and case-disposition of "Pending/Undisposed".  Also the case met all criteria for auto close/dispose as outlined by the AODC which included 1) No future events.  2) No outstanding warrants. 3) No events scheduled in last 60 days.  4) No money outstanding. 5) All charges were disposed | |

## Case Disposition

| Disposition | Date |
|---|---|
| Pending | |
| ****** | 05/05/2016 |

*Exhibit*

*#3*

inmates shall immediately report the encounter to staff an comply with all Department rules and regulations.

**426.04**     **Inmate-to-Staff Conflicts**

1.     In a correctional setting, staff must recognize the potential for situations with inmates that may result in personal discomfort but may not constitute a legitimate conflict. A staff member with a potential inmate conflict shall submit a confidential incident report to their respective Superintendent, explaining the potential conflict. In cases where the inmate claims a conflict with a staff member, IPS shall interview the staff member to determine whether a conflict exists and if so the seriousness of the conflict.

2.     Familiarity alone between staff members and inmates does not constitute a conflict. In order to be considered a conflict, these situations shall be determined to violate the security of the institution or compromise the position of the staff member.

   Examples of inmate-to-staff conflicts may include but are not limited to:

   a.     Serious inmate threat to do bodily harm to staff or family where staff have reason to believe that an assault may be carried out;

   b.     Staff member or close relative thereof was the crime victim;

   c.     Staff member is victim of a serious inmate assault;

   d.     Staff member and inmate are closely related.

3.     The Superintendent shall ensure that the matter is referred to the IPS Team Commander, who shall conduct an investigation. The investigation shall include:

   a.     A detailed interview with the staff member involved to determine the nature of the claim and the names of the potential inmates and witnesses.

   b.     Researching and cross-referencing both internal and external documents and data to include any relevant incident reports, disciplinary reports, investigations, outside agency reports and intelligence information.

   c.     Interviews with anyone who may have knowledge of the situation or can offer useful information.

   d.     Validation of the information received. To validate a claim, the Investigator shall gather all information and evidence, then weigh

and determine, as best as possible, whether the information is valid and may be relied upon to make decisions.

e.    A completed investigative package, which shall include the all supporting documentation, findings, conclusions and recommendations, shall be forwarded to the Superintendent for review.

f.    The Superintendent shall review and sign off on each investigation to ensure that each investigation is complete, thorough and that any and all conclusions are supported by facts.

g.    The Superintendent shall note their recommendation in IMS and forward the Inmate-to-Staff Conflict supporting documentation to the appropriate Assistant Deputy Commissioner for final review.

h.    If a conflict is approved, the Assistant Deputy Commissioner shall forward the Inmate-to-Staff Conflict Form to the Director of the Classification Division, Superintendent and the staff member declaring the conflict.

i.    Whenever possible, an approved conflict shall result in the inmate being moved to another institution with the same security rating. If this is not possible, consideration shall be given to reassigning the staff member to another institution or an area of the institution that shall minimize the opportunity of contact between the involved parties.

**426.05**     **Documentation of Validated Conflicts**

1.    The only individual(s) authorized to document conflict issues in the IMS are those individuals authorized to do so by the Superintendent. All conflicts or claimed conflicts shall be documented in the IMS conflict source screen as soon as possible. A notation that the conflict is pending review with IPS is to be entered into the comment field until the final determination has been made.

2.    The authorized staff member shall document the conflict or pending conflict on the appropriate conflict screen in IMS. If a conflict is established, it shall be noted in IMS as "active." If the conflict is not established, "active" should not be indicated. The authorized staff member shall make a notation in the IMS conflict source screen comment section. The notation to include the inmate's commitment number, name, interview date and site. The authorized staff members shall include as much of the matter as may be entered without putting either of the involved parties at risk.

*Exhibit #4*

# THE TAKING OF CELL 15

# A look at secrecy, assaults, and accountability inside Massachusetts' maximum security prison

**This story was reported by Mark Arsenault, Matt Rocheleau, and Spotlight editor Patricia Wen. It was written by Arsenault.**

Boston Globe Spotlight Team

August 14, 2021

T he five-member Department of Correction tactical team strode purposefully down the P2 cellblock of the Souza-Baranowski Correctional Center. The officers' mission was clear: remove one of the two prisoners locked inside Cell 15. And they were ready, carrying tasers, accompanied by fierce patrol dogs, and geared up in black protective armor.

The prisoners had been left in the empty cell in only their underwear.

It was about 2:40 p.m. on Jan. 22, 2020, and no ordinary day at the state's only maximum-security prison, a sprawling facility in the woods of Central Massachusetts with, at the time, about 740 prisoners — mostly men convicted of serious crimes and those who've tallied too many disciplinary violations at other prisons. Tensions are normal here, but this was different: The facility was still in an extended lockdown after a violent assault on correction officers had injured four of them 12 days earlier, on Jan. 10, in the N1 unit, an adjacent cellblock.

The prisoners alleged to have taken part in the attack had been sent to other prisons, and now it was time, correction officials resolved, to reorganize the institution and remind those left behind who was in

charge. Cells and prisoners would be searched, forcibly if need be, for weapons and other contraband.

It is called a shakedown, and there is no requirement to play nice.

Most of what happened next, after the operation began, is all but impossible to know, hidden behind the thick cloak of secrecy that routinely blocks scrutiny of prison life here — and almost all efforts at accountability in the state correction department. Were scores of prisoners brutalized during the shakedown, as they say? Were excesses tolerated, even encouraged by Souza authorities? Were official accounts of what happened sanitized or, as seems clear in some cases, baldly falsified?

There are few openings to try to break through to the truth, but there was one — in Cell 15. The Spotlight Team, after months of investigation, was able to compile an account of what happened there, examining available records, obtaining cellblock video and photos, as well as sound files recorded as the cell was entered and its occupants rousted, and finding key players willing to risk being interviewed and quoted by name.

What emerges is a chilling picture, bristling with hard questions about the proper limits of prison administration, about a wave of alleged assaults and abuses, about regulations unenforced, and about the rights of those confined to prison — questions seldom examined in a state where,

despite its progressive profile, public access is handcuffed and secrecy rewarded.

After glimpsing the force of men gathering outside, the men in Cell 15 could sense what might be coming. Dionisio Paulino, then 26, and Robert Silva-Prentice, then 22, had been incarcerated for serious offenses but neither had been involved in the Jan. 10 assault. That morning they had been roused from their regular cells, strip-searched, and permitted to dress only in white boxer shorts, T-shirts, and flip-flops. They were taken to the gymnasium and told to face a wall while the cells in the unit were searched for contraband. Then they were escorted separately to this empty cell, No. 15, and locked together. The men had never been "cellies" -- cellmates -- before. They recognized each other from around the unit and were friendly enough, though not really friends.



Dionisio Paulino (left) and Robert Silva-Prentice were briefly incarcerated together in Cell 15 at the Souza-Baranowski Correctional Center.

Paulino had a bad feeling. He told Silva-Prentice this might be a "shitbag cell," using slang for a cell known to be in a security camera blind spot, where anything that happened to the prisoners would not be on tape.

As it turned out, he was right.

Around 2:43 p.m., the baby-blue steel door to Cell 15 suddenly slid open and the DOC tactical team surged inside. Officers shouted: "Stop resisting! Stop resisting!"

Just outside the cell door, a DOC patrol dog was held back by its handler. The animal barked wildly, pawed the floor, snapped its jaws, and strained against its leash, trying to charge at the men in Cell 15.

03:58

On Jan. 22, 2020, a five-member Department of Correction tactical team entered Cell 15 at the Souza-Baranowski Correctional Center, the state's only maximum-security prison. The Spotlight Team, after months of investigation, was able to compile an account of what happened there, examining available records, obtaining cellblock video and photos, as well as sound files recorded as the cell was entered and its occupants rousted. What emerges is a chilling picture. (Video produced by Caitlin Healy, Mark Arsenault, and Patricia Wen/Globe Staff)

Paulino ended that day at the hospital with bloody gashes. Silva-Prentice said he spent the afternoon crying out for medical attention for himself, which never came.

They were battered and angry but felt lucky it wasn't worse; when the team stormed in, the two men had thought they might die, they said.

How their harsh handling fits into the larger frame of this prison operation is hard to document except for this: Data show more prisoners at Souza complained about excessive force by officers in the early weeks of 2020 than any other time in the recent history of the institution — even after the men accused of participating in the Jan. 10 assault on Souza staff were transferred to other facilities.

Between Jan. 10 and March 1, 2020, men incarcerated at Souza lodged 118 allegations of excessive force by officers, according to Prisoners'

Legal Services of Massachusetts, a nonprofit organization that aids and advocates for incarcerated people.

In the same time period in 2019, there were four excessive force complaints at Souza.

Same time period this year? Six.

## Complaints of excessive force spike

From Jan. 10 to March 1, 2020, Prisoners' Legal Services of Massachusetts received a surge of allegations from prisoners at Souza about brutal treatment by authorities, far more than the same time period the year before and the year after.

Source: Prisoners' Legal Services data
RYAN HUDDLE/GLOBE STAFF

✸ A Flourish chart

Men reported being beaten, slammed into walls, shocked by tasers, tormented with chemical agents, threatened with dogs, taunted with racist remarks, and placed in stress positions for hours while handcuffed. Prison officials defend the level of force used — sometimes, the Spotlight Team found, implausibly: In the case of the men of Cell 15, "use of force" reports filed by at least four officers who witnessed the events contain obviously false information.

The state DOC says its overwhelming response to the Jan. 10 attack was "swift action to restore order" at an institution that is truly difficult and often dangerous to manage.

The Department of Correction declined to make anyone available for interviews with the Spotlight Team regarding allegations of prisoner abuse at Souza; the DOC also declined to respond to specific written questions, saying it could not comment on matters related to litigation or ongoing investigations. The department issued a one-paragraph statement through a spokesman, saying in part:

"DOC expects all personnel to uphold the highest standards of respect, security, care and adhere to the Department's Code of Conduct, and all allegations of staff misconduct are taken seriously and can be reported

through multiple channels. The Department thoroughly investigates every allegation of staff misconduct brought to its attention."

The Globe has confirmed that the US Department of Justice last year opened an investigation into allegations of prisoner abuse at Souza in early 2020. Patty DeJuneas, a lawyer who represents Paulino and Silva-Prentice, told the Globe that DOJ investigators this past May asked her to provide cellblock video related to Paulino's removal from Cell 15.



Attorney Patty DeJuneas, outside the John Joseph Moakley United States Courthouse in Boston, represents Paulino and Silva-Prentice, both of whom allege mistreatment by officers during an extensive lockdown in early January 2020. (Craig Walker/ Globe Staff)

Massachusetts' troubled correction department is already facing action by the federal government over its treatment of individuals in a different investigation. A two-year federal civil probe made public in November found that DOC's lack of trained staff and the harsh use of restrictive housing, also known as solitary confinement, result "in actual serious harm" to prisoners at Souza and other facilities, "including self-harm and suicide," the Justice Department wrote. Federal and state officials have been in confidential negotiations over remedies to correct these problems. A court-enforceable consent decree resulting from these discussions is expected at any time. In June, in response to another scathing report, the DOC pledged to phase out the punitive use of solitary confinement.

Civil litigation related to the abuse allegations of early 2020 is underway and more is coming. The suits draw on testimony from numerous prisoners, including accounts from Paulino and Silva-Prentice about their treatment by tactical team members.

Prisoners' Legal Services, representing clients at Souza, is drafting a federal excessive force lawsuit against the Department of Correction. State regulations forbid the use of force as a punishment. PLS will allege that department leadership "authorized and encouraged" retributory violence against incarcerated men, according to a statement released by Elizabeth Matos, the group's director. "What happened at Souza last year is one very clear example of how this system is not only failing to

rehabilitate those behind the wall but, quite literally, harming them," the statement said.



Souza-Baranowski Correctional Center, near the border of Lancaster and Shirley, is the only maximum-security facility in Massachusetts. (David L. Ryan/ Globe Staff)

Souza-Baranowski opened in 1998, amid a steep rise in incarcerations due to tough sentencing laws from the 1980s. Its namesakes were James Souza and Alfred Baranowski, employees at Norfolk Prison Colony, murdered in 1972 by a prisoner serving a life sentence.

The maximum-security complex is shaped a bit like a giant crab, with common areas such as the chow hall in a middle section and two clusters

of slender housing units angling off like claws. The architectural style is blunt functionality — lots of concrete, razor wire, and tiny windows. The prison's capacity is 1,427, but its current population is barely one-third of that; it held 516 men as of July 26, according to DOC figures.

The state uses a points-based system to determine who gets sent to Souza, considering factors such as the severity of the crime, criminal history, and disciplinary records at other prisons. Souza is normally an early stop for men convicted of murder; other serious convictions can also lead to time there.



A press conference of top state prison officials was held in 1972 after two prison employees, James Souza and Alfred Baranowski, were killed when a convicted murderer attempted to shoot his way out of a medium-security prison. More than two decades later, those victims would have the state's maximum-security prison named after them. (Joseph Dennehy/ Globe Staff)

It has been home to some of the most notorious convicts in the state, including two who died there: John J. Geoghan, the former priest who abused children over decades, was strangled by another prisoner in 2003, and Aaron Hernandez, the New England Patriots star and murder convict, hanged himself inside his cell in 2017.

The atmosphere, by all accounts, is stressful. Former prisoners and staffers told the Globe that race is a seething issue — a mostly white staff supervises a predominantly Black and Hispanic population. Fights and assaults are commonplace. Men in mental crisis regularly try to harm or kill themselves.

11/30/21, 2:27 PM
Case 1:21-cv-12036-RGS   Document 1-1   Filed 12/13/21   Page 21 of 56
Spotlight: The taking of Cell 15 - The Boston Globe

## Racial differences inside correctional institutions

In Massachusetts prisons, an overwhelmingly white staff supervises a prison population made up mostly of people of color. In Souza-Baranowski, the disparity is even greater than statewide.

White    Black    Hispanic



Source: State prison data. · Note the percentages do not all add to 100 percent because this chart does not include all races and ethnicities.
JOHN HANCOCK/GLOBE STAFF

✷ A Flourish chart

On Jan. 10, 2020, the images emanating from Souza were truly startling. DOC officials publicly released security video of a major assault on staff which remains on the agency's Facebook page. The violence broke out while prisoners were on recreation time out of their cells. Roughly 20 men in the prison's N1 unit piled onto officers, throwing punches in a wild melee. Four officers were hurt; one was hospitalized with head trauma and a broken nose, another with a broken jaw and fractured vertebrae in his neck.

The prison went into lockdown. Men were shut inside their cells and privileges suspended.

Over the next two to three days, according to court testimony, the roughly 20 men who allegedly took part in the assault were transferred out of Souza to other prisons. Sixteen were criminally charged.

After the alleged perpetrators were removed, prison officials reorganized the prison, consolidating men known as recent troublemakers on the north side of the facility. Along with the reorganization, the officials ordered a facility-wide shakedown, searching the cells for contraband.

To complete this work, Souza officials proposed using temporary help from the DOC Special Operations Division, a group of officers from various prisons around the state who undergo extra training to handle emergencies.

Top brass at DOC spent days developing the plan to use the tactical teams, which was approved by Thomas Turco, then-secretary of the Massachusetts Executive Office of Public Safety and Security, an agency spokesperson confirmed. Governor Charlie Baker, through a spokeswoman, declined to say if he knew in advance of the DOC's plan for a tactical team shakedown.



Thomas Turco, shown testifying at a hearing in 2019 with Governor Charlie Baker, served as Massachusetts' secretary of public safety until he retired in July. Turco previously ran the

Department of Correction and approved the tactical team operation in early January 2020 at Souza-Baranowski prison. (Sam Doran/State House News Service)

The tactical teams began work inside Souza around Jan. 21, the day before Paulino and Silva-Prentice were moved to Cell 15.

Dozens of complaints about excessive force are linked to the several days the tactical teams were active inside the facility. In the words of incarcerated men, taken verbatim from separate complaints filed in Souza's internal grievance system:

# "Then my head was smashed into the wall multiple times. When I tried to avoid the wall I was told to 'stop resisting,'

An incarcerated man from Housing Block N1 Jan. 22



Each of those grievances were denied, according to DOC records. In fact, the Globe was able to review more than 50 grievances alleging staff misconduct in Souza in the weeks after Jan. 10, and the prisoners did not win any of them. A few were referred for more investigation. Many were

denied with simply this terse and unrevealing explanation: "It has been determined that no staff misconduct was discovered."

**Prisoner grievances at Souza-Baranowski**

Prisoners at Souza-Baranowski Correctional Center filed 1,079 grievances, including for excessive force, in 2020. More than half of those were filed within the first three months of the year.

Source: Massachusetts Department of Correction
JOHN HANCOCK/GLOBE STAFF

✹ A Flourish chart

The shakedown at Souza was conducted in a highly charged atmosphere. Prison officials asserted that the Jan. 10 melee was a pre-planned attack

initiated by prisoners associated with the Latin Kings gang and, ominously, that more assaults were coming.

"Our intelligence suggested that this was an approved assault," said Steven Kenneway, then Souza's superintendent, in court testimony last year at a motion hearing over the lockdown at Souza and limitations imposed on prisoners' access to their lawyers and legal paperwork. "The other intelligence that we were receiving focused squarely on the fact that this was not over, there would be additional assaults on staff."

That official assessment of the cause is now heavily disputed, the Spotlight Team has found. DOC officials did document verbal threats and received tips from informants about prisoners threatening more violence. However, DOC e-mails obtained by the Globe say that Kenneway and other state officials were told almost immediately that the assault was a burst of impromptu violence stemming from a long buildup of conflicts in the unit, not a preplanned attack.



In Suffolk Superior Court in February 2020, Steven Kenneway defended the extended lockdown at Souza-Baranowski as necessary to restore order. He disputed allegations that authorities continued to deny prisoners access to their legal papers. A judge later found part of Kenneway's testimony not credible, and ordered such legal access be immediately restored. (Jesse Costa/WBUR)

"Multiple sources interviewed claimed ... that the assault was not planned," reads a Jan. 11, 2020, e-mail from DOC Inner Perimeter Security Officer Fletcher Beach to a dozen other officers and department officials, summarizing interviews with prisoners after the melee. "The inmates all claimed that they had felt disrespected by the officers in the unit and the argument escalated to the point of becoming physical."

DOC officials also received at least two letters from prisoners who wrote that the fight erupted because prisoners felt they had long been

mistreated by certain officers. One letter said that members of three gangs "feel as though they haven't been treated fairly by these two officers when it come[s] down to unit job assignment and/or any other privilege within the unit."

Criminal defense attorney Joseph Hennessey told the Globe that the Jan. 10 melee began with a verbal argument about officers allegedly telling certain Latino prisoners they were not going to get coveted job assignments if they associated with Hennessey's client, Souza prisoner Carlos Bastos.

## Number of complaints



**Grievances about overall conditions and treatment filed by Souza-Baranowski prisoners in the first three months of 2020**



**Went to internal affairs for further investigation**

0

**Ended in a totally favorable ruling to the prisoner**

Source: Massachusetts Department of Corrections data

Hennessey said officers tried to ostracize Bastos because years earlier he had assaulted a correction officer. In 2015, Bastos pleaded guilty to criminal charges from the incident and had one month added to his sentence. Afterward, Bastos and that officer were supposed to have been kept apart, per a judge's order, Hennessey said, but the officer eventually returned to work in the same unit where Bastos lived and allegedly harassed Bastos. The prisoner repeatedly filed paperwork to be separated from the officer, but DOC refused, Hennessey said.

The DOC, through its spokesman, declined to address questions related to the cause of the Jan. 10 assault and to Bastos.

At the time of the melee, Silva-Prentice was assigned to the P2 unit at Souza, walled off from the mayhem. He told the Globe that the men in his unit were unaware of the Jan. 10 assault in the N1 unit until they saw a story about it on the TV news.

No matter. Every unit in the facility, including theirs, would soon be swept up in the prison-wide shakedown.

Case 1:21-cv-12036-RGS    Document 1-1    Filed 12/13/21    Page 30 of 56

Reporting on what happens inside state prisons is difficult for a number of reasons, foremost among them the opaque nature of the correction system.

"Prisons and jails are among the least transparent institutions in government," said Paul Wright, director of the Human Rights Defense Center. "Most Americans who follow the news will know more about what's going on in North Korea than in the prison or jail five miles from their house."

## "Prisons and jails are among the least transparent institutions in government."

Paul Wright of the Human Rights Defense Center

🐦 Share this

The Department of Correction bristles at oversight, even from the people authorized to provide it. State Senator Jamie Eldridge, an Acton Democrat, visited Souza shortly after the Jan. 10 assaults and was critical of DOC's resistance to implement reforms. Eldridge holds a powerful position as Senate chair of the Joint Committee on the Judiciary. Yet the state's top public safety officer dismissed the lawmaker behind his back.



State Senator James Eldridge was among a group of lawmakers who made a surprise visit to Souza-Baranowski after prisoners there said they were unfairly targets of a brutal crackdown in early 2020. (Erin Clark/Globe Staff)

"Eldridge is to be ignored from here on out," wrote Turco, then a Baker administration Cabinet member, in an internal e-mail chain that included DOC Commissioner Carol A. Mici. "Once again he has shown that he is incapable of speaking truthfully."

Told of Turco's remarks, Eldridge said he thought he had a professional relationship with Turco, despite their disagreements, and was disappointed in the former secretary's "juvenile comments."

Turco, who retired in July and was replaced by one of his deputies, Terrence Reidy, declined to answer questions about the allegations of excessive force at Souza. Reidy, who was likewise involved in the planning of the Souza tactical team operation, also declined to answer questions. So did Kenneway, who was Souza's superintendent at the time; he retired in June.

In lockstep with their superiors, more than 100 officers who served on the DOC tactical teams that performed the sweep refused to comment when contacted by the Globe. In response to the Spotlight Team's raft of telephone calls to these officers, their labor union issued a notice telling members they should not talk to the media. Meanwhile, DOC lawyers have sought gag orders seeking to prevent DeJuneas, the lawyer representing the men in Cell 15, from disclosing evidence to the public, she said.

The stonewalling is in keeping with a zealously enforced ethos of secrecy. As one former Souza prisoner told the Globe, "The walls are there not just to keep us in, they're to keep you guys out."

Silva-Prentice woke up the morning of Jan. 22, 2020, in his regular cell, No. 21 on the P2 unit. He figured it would be an uneventful day because the institution was still on lockdown following the Jan. 10 melee.

But in the late morning, maybe around 11 or a bit later, a tactical team entered his cell and ordered him to strip for a body search. "It was really aggressive," Silva-Prentice said, "They were pointing the [taser and pepperball] guns at me,' saying, 'Back the [expletive] up, go to the back of your cell and strip.' "

Silva-Prentice is in Souza for the 2017 death of 17-year-old Yanuel Viloria in Roxbury. A jury convicted a Waltham teenager, Malik Phillips, of shooting Viloria and convicted Silva-Prentice of sharing his "intent," according to the Suffolk District Attorney's office. His conviction is under appeal.

Silva-Prentice told the Globe he took off his clothes for the body search. Then he was told to dress in only a T-shirt, boxers, and shower sandals. He was handcuffed, taken to the prison gymnasium, scanned with an X-ray machine to see if he had any metal hidden in his mouth, and then ordered to stand and face the wall, he said.

Court records confirm that "men remained standing, handcuffed, in the gym for two hours."

Eventually, Silva-Prentice was escorted not to his normal cell, but to Cell 15.

The cell had the typical prison sink, toilet, and mirror. On the left side, bunk beds. In the right corner, a little desk with a seat, and small shelves for toiletries. A typical cell at Souza measures 13 by 7 feet. The cell had been emptied and no property was in it, he said.

Paulino was already there, also stripped to his underwear. He was also in for hard time, having pleaded guilty in 2013 to manslaughter in the 2011 fatal shooting of 19-year-old Gilmar Tobar, in Lawrence, when Paulino was 18.

Both thought it strange that a Black man and a Latino man would be locked up together. Normally, cells are segregated by race and ethnicity.

Sign up to receive Globe investigations and behind-the-scenes information about how they come together.

Your e-mail:

Your e-mail address

Subscribe

"They don't like mixing races with each other, just in case, like, a problem ensues on the unit with different races," Silva-Prentice told the Globe. "They usually try to keep Blacks with Blacks, Spanish with Spanish, white with white. And I'm Black, you know what I'm saying? It's really rare to put a Spanish person and a Black person together."

In the hour before the tactical team entered Cell 15, as many as two dozen officers were working on the cellblock. At one point, officers wheeled carts piled with pillows and mattresses to the center of the unit, where the DOC had set up a tabletop metal detector, looking like the equipment used to scan personal property on the way into a courthouse. They fed the bedding through the machine, scanning for contraband, such as homemade weapons.

The atmosphere among the officers appeared calm and businesslike, according to a review of cellblock video acquired by the Spotlight Team.

Then one of the tactical teams got orders from then-DOC Deputy Commissioner Paul Henderson to place Paulino in restraints and escort him to another cell, according to incident reports filed by officers.

The tactical team was specifically told, according to officers' reports and subsequent testimony, that Paulino was a boss of the Latin Kings gang and had commanded gang members in the prison to assault staff. This intelligence about Paulino came from an informant whose identity has not been revealed. It was the first time this particular informant provided information to prison authorities, according to a one-page "informant information checklist" generated by the DOC.

Paulino denies the accusation and says he never told or tried to persuade anyone to attack officers. "Absolutely not," he said. "I was in that unit for

years and I ain't never had problems with nobody. Nobody was even discussing anything like that."

A DOC hearing officer would later dismiss a disciplinary charge against Paulino that was based on the informant's information. The hearing officer noted that there was no corroborating evidence and that the informant admitted he lacked "personal knowledge" that what he was saying was true. The tactical team was apparently not told any of this by superiors — only that Paulino was ordering assaults on staff. Unaware of this update, they would likely have processed their orders within the larger narrative, now also disputed, that the Jan. 10 attacks had been pre-planned by Latin Kings.

The men in Cell 15 had already each been moved twice that day with no apparent problems, from their separate cells to the gym and from the gym to Cell 15. Tactical team members could have ordered Paulino to "cuff up" before the team entered. That means the prisoner would put his back to the door and stick his hands out the trap slot, so the officers could apply handcuffs. That way, he would already be in restraints when the door opened.

Reports filed by the officers say they did not command the prisoners to cuff up in order to gain "a tactical advantage/element of surprise," apparently so that the men in the cell would not have time to prepare to fight. They did not explain this further.



A correction officer in 2011 navigated the security camera system at Souza-Baranowski, which used hundreds of cameras to monitor prisoners' activities. (Jessey Dearing for The Boston Globe)

The tactical team got into place around 2:43 p.m.

Silva-Prentice was on the top bunk. Paulino was at the cell door, peering through a crack that gave him a narrow view to the tier outside.

"'I think they're coming to this cell,'" Silva-Prentice recalled Paulino saying.

The cell door suddenly slid open and at least five members of the team charged in. DOC K9 officer Sergeant Mark O'Reilly held his patrol dog, Omar, just outside the cell. The dog and two others on the tier barked incessantly.

From the cell came the sounds of violence.

There is no video of what happened inside Cell 15 because no officer was assigned to record Paulino's removal with a hand-held video camera, widely considered best practice in the corrections industry. The point of videotaping forced cell entries and cell extractions is to protect the prisoners from excess force and the officers from unfounded claims of abuse.

DOC rules on videotaping are contained in secret department documents, not available to the public. A copy of DOC's "Forced Movement of Inmates" policy, obtained by the Spotlight Team, however, states explicitly that "before any cell extraction or forced cell entry, the shift commander shall designate a video operator."

The video operator is supposed to remain just behind the leader of the cell entry team, according to the policy.

"Once the team enters the cell area the recording shall be continuous," the policy states. "The video camera operator shall never take the camera off the cell extraction or forced cell entry during the course of the action for any reason."

In the case of Cell 15, officers wrote up the encounter as a "spontaneous" use of force, where video would not be expected — this despite clear evidence that the operation was anything but spontaneous. The team had explicit instructions from Deputy Commissioner Henderson "to remove Inmate Paulino from his cell utilizing force, up to and including

Chemical Agent, Electronic Control Device [taser], Specialty Impact Munition, and K9 if necessary," according to department documents.

What took place at Cell 15 appears to be the literal DOC definition of a "planned" use of force in its regulations, in which the "level of threat by the inmate is not immediate" and officers have time to put on protective extraction gear and discuss strategy.

"My understanding of protocol is if you have the time and people are suiting up then by all means it should be filmed," said Brian Dawe, director of One Voice United, a national group that advocates for correction officers. "But realize who sets the protocol and who calls the shots. That's being called from above."

The Massachusetts DOC, through a spokesman, declined to answer questions about why no officer was assigned to videotape the cell entry or whether the videotaping policy did or did not apply in this case. Henderson in May stepped down as deputy commissioner to take a different DOC job.

There is no doubt that the prisoners inside Cell 15 got roughed up —
that's one thing on which both sides agree. The dispute is over who
was responsible: Did the prisoners greet the team with raised fists?
Or with their hands up in surrender?

Reports filed by officers say that when the door opened, the 150-pound Paulino was in the middle of the cell in a "fighting stance," fists clenched and ready to throw punches. Officers say Paulino refused orders to get down, so a team member shot him with a taser and Paulino fell back. But he popped back up and "began throwing kicks and punches," according to a report by Robert D'Amadio, at the time a sergeant with 15 years of experience.

DOC Captain Jason Lanpher reported that he "struck inmate Paulino with a closed fist punch to the head knocking him back into the steel bunks and chair and onto the floor."

D'Amadio wrote that he and other team members "took [Paulino] down to the floor," tased him again when he wouldn't stop fighting, and then forced him into handcuffs. D'Amadio said that during the struggle Paulino kicked him twice in the thigh. Officers also said that the contraband search of Paulino's regular cell turned up a 5-inch piece of metal sharpened to a point.

Meanwhile, the way the officers tell it, Silva-Prentice punched down from the top bunk on "staff." Officers pulled him off the bunk to the floor. When he allegedly continued to thrash, they tased him multiple times on the stomach and thigh, reports say.

The men of Cell 15 tell a radically different story.

"They just kept telling us 'don't [expletive] move' and 'stop resisting,'" Silva-Prentice told the Globe. "We weren't even doing anything at the time. I'm just sitting there on the top bunk putting my hands up. 'Don't move! Stop [expletive] resisting. Don't move!' And they just [expletive] grabbed me off the top bunk and slammed me on the floor."

The 140-pound Silva-Prentice said he was kicked in the face, shocked repeatedly with a taser, and had hair ripped out by the roots. He never threw a punch, he said.

"They had Paulino at the back of the cell," Silva-Prentice said. "And one C.O. was just crushing him with punches. Punching him in his face, beating him up."

"At that point in time, it's like, damn, am I gonna die in here? That was like the only thing going through my mind. I thought I was going to die."

Silva-Prentice said he was tased several times in the back while face-down and handcuffed. The New England Innocence Project retained a doctor to review photos of Silva-Prentice's injuries, taken three weeks after the incident. The photos showed partially healed wounds on his upper back and the back of his upper arm. The doctor, Kevin P. Kent, a professor of emergency medicine at the University of Massachusetts Medical School, found "to a reasonable degree of medical certainty" that the marks were caused "by the application of a Taser-type conducted energy weapon." Silva-

Spotlight: The taking of USP 5 - The Boston Globe

Prentice had no taser wounds on the front of his body, where the officers said they shocked him, according to his lawyer, DeJuneas.

Spotlight: Failing at Death — The Boston Globe

After Silva-Prentice was handcuffed, officers took him out of the cell and marched him out of the way, several cells down the tier, to wait until Paulino was taken out.

The K-9 officer, O'Reilly, and his patrol dog are visible on security camera video, walking for several steps alongside Silva-Prentice as he is escorted down the tier. In the video, Silva-Prentice makes a quick sidestep away from the dog. The animal snaps and lunges at him but is held back by its leash.

Then the video shows O'Reilly turning the dog around and walking it back toward the cell.

Paulino appears in the video just outside the doorway. He is wearing white boxers and a T-shirt. His hands are cuffed behind his back. Two armored tactical officers hold his arms.

Almost the instant Paulino appears, the dog attacks him.

First the animal lunges at Paulino, bites his chest. Paulino staggers. The officers continue to push him. The dog appears to grab Paulino's boxer shorts and pull them off him. He falls on is taken to the floor by the officers. The dog is biting him then sinks its teeth into Paulino.

Paulino's screams rip through the block, something out of a horror movie. Men locked inside their cells immediately begin to scream and kick their steel doors in thunderous protest.

"My inner thigh — the tissue was ripped out," Paulino said, in response to questions from the Globe. "I thought it was going to kill me."

## "My inner thigh — the tissue was ripped out. I thought it was going to kill me."

Dionisio Paulino

🐦 Share this

The officers who escorted Paulino said later that the prisoner verbally threatened the dog and then tried to kick it before the dog attacked. Paulino denies saying anything about the dog. "I had just got beat up," he said. "I had no intention to say nothing to nobody." He insisted he never tried to kick the animal.

Security camera video is not detailed enough to fully settle the question. But it shows Paulino with almost no time to react to the dog, which jumps on him almost the second he appears out of the cell. It also shows that the agitated dog had lunged unprovoked toward Silva-Prentice just moments earlier.

O'Reilly, the dog handler, claimed in his report on the incident that Paulino exited the cell violently, "briefly breaking free from the escort and attempted to kick my K-9 partner."

That claim— that Paulino broke free of his escort — is not true. It is contradicted by both security camera footage and the testimony of the officers who were escorting the prisoner.

The escort officers — D'Amadio and Lieutenant Stuart McCulloch — each testified they had Paulino by the arms the entire time, according to an audio recording of a private internal DOC administrative hearing in October 2020, acquired by the Spotlight Team. D'Amadio responded to

direct questions from Paulino's former lawyer, J. Daniel Silverman, about his grip on Paulino:

Q: "You were holding onto him through the time you had him in the wrist restraints, all the way through the door and then up to the point the dog came into play?"

D'Amadio: "Yes."

Q: "And who else was holding him?"

D'Amadio: "Lieutenant McCulloch."

McCulloch, questioned in the same hearing, confirmed multiple times that the officers maintained hold of Paulino throughout the escort. In one such exchange:

Q: "You had one arm and another C.O. had the other arm?"

McCulloch: "Yes, Sergeant D'Amadio."

Q: So you both had him — physically, you had him, correct?"

McCulloch: "Yes."

Yet despite the video evidence and that testimony, at least three other officers made the same false statement about Paulino breaking free, in

almost the same language.

Sergeant Raymond G. Harvey filed a report, dated Feb. 19, that stated, "Inmate Paulino briefly broke free of the escort officers..."

Officer Evan Laranjo filed a report dated Feb. 18 that said, "I witnessed the inmate struggling and briefly break free of the escorting officers..."

Officer Daniel Paul filed a more dramatic version, dated Feb. 19, stating that Paulino "appeared to break free of tactical staff, charge out of the cell and assault the K9 with a kick."



Some of the injuries suffered by prisoner Dionisio Paulino. He received stitches for lacerations from the dog attack.

The DOC, through its spokesman, declined to address questions related to the false statements in the official reports. Harvey, reached by phone, declined to comment. The other three officers did not return messages left directly or passed through their union representatives.

Paulino's lawyer, DeJuneas, said DOC staff filed false reports because there is no legitimate explanation for why a handcuffed man, in his underwear and under escort, would be mauled by a dog.

A heavily redacted report from an internal DOC investigation into allegations of staff abuse of Paulino and Silva-Prentice concluded in April 2020 there was an "absence of information corroborating the allegation of staff misconduct." Other reports show DOC officials found a few policy violations in reviewing the incident, including that Silva-Prentice was never seen by medical staff, which was chalked up to "a miscommunication."



Souza-Baranowski has a capacity for about 1,430 prisoners, but its recent population is barely one-third of that — it held 516 men as of July 26, 2021, state figures show. (David L. Ryan/ Globe Staff)

After the dog attack, Paulino was taken to the prison infirmary and then to a hospital in Leominster. He received stitches for the dog bite lacerations, and was examined for a lump on his head, abrasions on his face, and pain in his jaw.

Officers locked Silva-Prentice back into Cell 15, alone. He said that he called out for medical attention and that other men in cells nearby did the same on his behalf.

"I was just like, distraught, you know what I'm saying?" he told the Globe. "I tried to call for medical. I wasn't getting it. I'm not too proud to say that I cried."

In early 2020, when the allegations of widespread excessive force at Souza first surfaced, Governor Baker said he trusted the DOC to investigate itself.

"There is a process in place for pursuing an investigation," he said, according to a WBUR report from February 2020. "The [DOC] will collaborate and cooperate with whatever people want to pursue on that. But I have a lot of faith in the department and in the actions it's taken to ensure that inmates and correctional officers at Souza are safe."

Within weeks of that statement, the coronavirus pandemic shut down much of the state and the country, and the violence at Souza faded from

public consciousness.

There is no evidence of any comprehensive or independent state investigation into the unprecedented number of excessive force allegations, despite complaints from advocates that were hand-delivered to the governor's office. It appears the department processed allegations against staff through an internal prison grievance system that advocates and former prisoners say is rife with conflicts of interest. Attorneys for prisoners assert that DOC officials issued disciplinary charges to retaliate against prisoners and to thwart their efforts to win grievances.

Paulino received disciplinary charges for the incident in Cell 15. He was cleared by a DOC hearing officer of allegations related to ordering attacks on officers but found responsible for assaulting staff inside the cell and trying to kick a dog. He was given 18 months in what the DOC calls restrictive housing and what most call solitary confinement.

**Comments: Join the discussion**

*Please send any comments or tips to mark.arsenault@globe.com, or contact the Spotlight Team at spotlight@globe.com or 617-929-7483.*

RECENT SPOTLIGHT TEAM STORIES

# Legislators, advocates call for Mass. prison reforms after Spotlight investigation into excessive force allegations

# Gov. Baker says prison shakedowns should be videotaped

# Lessons from 'The taking of Cell 15': Reform corrections

## Lack of effective prison oversight results in hidden cruelty. It's time to fix this

Case 1:21-cv-12036-RGS Document 1-1 Filed 12/13/21 Page 56 of 56

# Beyond the Boston Globe's Spotlight team members, many others played a significant role in making this story possible

**Editors:** Scott Allen and Mark Morrow

**Chief digital designer:** Ryan Huddle

**Developer:** Vince Dixon

**Graphic designer:** John Hancock

**Audience experience:** Heather Ciras

**Photo editors:** Leanne Burden Seidl and William Greene

**Video producer and editor:** Caitlin Healy

**Copy editors:** Mary Creane and Michael Bailey

**Researcher:** Jeremiah Manion

**Social media:** Lauren Chooljian

**Illustrator:** Jeremy Traum

**Quality assurance:** Chelsey Johnson

© 2021 Boston Globe Media Partners, LLC